UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CR-00279-FL-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | **MEMORANDUM &** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| ANTONIO RASHAAD DOVINE | ) | |

_____

This cause comes before the Court upon Defendant's motions to suppress (DE-114, DE-123) statements he made to law enforcement officers. The government has responded (DE-118, DE-124), and an evidentiary hearing on the motions was held May 17, 2012. (DE-128, DE-145). At the direction of the Court, the parties have also submitted supplemental memoranda. (DE-139, DE-144). Accordingly, the motions are ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for entry of a memorandum and recommendation. For the reasons stated herein, the undersigned RECOMMENDS that Defendant's motions to suppress be granted.

I. **FACTUAL BACKGROUND**

On the evening of May 3, 2011, Defendant and his girlfriend, Erika McClarin, were arrested in connection with an attempted armed robbery of a BP gas station on New Bern Avenue in Raleigh. (DE-145, Tr. 13-15). Following the arrest, Detective Doug Bacon of the Raleigh Police Department interviewed McClarin, who was seven months' pregnant with Defendant's child at the time. McClarin waived her Miranda rights and confessed her involvement in the attempted robbery, as well as four other armed robberies. Detective Bacon and Detective Marcus Smith then met with Defendant in an interview room at the police station.

(Tr. 26). After introducing themselves to Defendant, Detective Bacon read Defendant his Miranda rights from a pre-printed form. Defendant agreed to waive his rights, signed a waiver form, and began speaking with the detectives. The interrogation was visually and audibly recorded. Almost nine minutes into the interrogation, the following exchange took place[1]:

Defendant: "Can I just have a lawyer?"

Det. Bacon: "You can. Most definitely."

Det. Smith: "I can't believe you let your girl go down like that."

Det. Bacon: "I can't believe that."

Det. Smith: "If that was my girl and she was pregnant, okay, I would take everything. I wouldn't want to have my baby in jail."

Defendant: "I admitted to my part, she said… (unintelligible)."

Det. Smith: "No, no. There's other things we want to talk about that you've committed. But you didn't want to talk. You want her to go down like that."

Det. Bacon: "That's fine. She's already admitted to what she's done and she's gonna go down as well as for the Hampton Inn. That she went over there with. That she's admitted going to over there by the Courtyard by Marriott. She admitted to that. So, um, we'll be talking to you in a few minutes. Well, it will probably be a while, there's a lot of warrants we gotta do."

Det. Smith: "Think about this right here okay. Your bond is going to be so high you won't be able to get out of jail. And then the other people you were with, they out there walking around, having a good time. You know, eatin' good, smokin' some weed, hangin' with some girls. And look where you're gonna be. You gotta think of yourself first."

Defendant: "I can talk to you by yourself?"

Det. Smith: "You can."

---

[1] No official, court-certified transcript of the interview exists. The undersigned has relied upon a copy of the recorded interview, filed as the government's exhibit 2, as well as the parties' attempted transcriptions of the interview (DE-118-1), and is satisfied to the accuracy of the excerpted conversation set forth above.

2

Detective Smith and Detective Bacon then left the interview room. A few moments later, Detective Smith returned to the interview room and re-advised Defendant as to his Miranda rights. Detective Smith informed Defendant it was necessary to re-advise him because he had "lawyered up." Defendant signed a second waiver form and proceeded to speak with Detective Smith.

The following morning, ATF Taskforce Officer Lisa Mendez visited Defendant at the Wake County jail in order to speak with him about the attempted robbery. When she spoke with Defendant, Officer Mendez had not yet reviewed the recorded interview from the previous night, and no one had informed her that Defendant had made any statements regarding an attorney. Defendant did not mention an attorney during his conversation with Officer Mendez.

At the evidentiary hearing, Detective Smith testified that when Defendant stated, "Can I just have a lawyer?," Detective Smith believed Defendant was asking a question, as opposed to a demand. Compared to other suspects interviewed by Detective Smith, Defendant's request for an attorney was "not as straight[]forward." (Tr. 32). Nevertheless, Detective Smith immediately "stopped asking questions about the robbery" because "at that point I gave [Defendant] respect that he asked for an attorney so I'm gonna stop asking any questions pertaining to the robbery." (Tr. 33). Detective Bacon similarly testified that Defendant's statement presented "a gray area in which I didn't want to cross." (Tr. 47). Both detectives therefore treated Defendant's statement as a valid invocation of counsel and stopped asking him questions about the robbery attempt. The detectives acknowledged that they nonetheless continued to make statements to Defendant. During direct examination, Detective Smith explained that he made the statements about McClarin and Defendant's anticipated bond "just [to be] honest and tell[] [Defendant] exactly what it is." (Tr. 38). Upon cross-examination, however, Detective Smith conceded that he made

3

these statements to Defendant because he was "trying to continue to get [Defendant] to say things against his interest." (Tr. 43).

Based on these facts, Defendant now argues Detectives Bacon and Smith failed to cease their interrogation after he unambiguously invoked his right to counsel. As a result, argues Defendant, any statements he made after invoking counsel should be suppressed. The government contends that Defendant's request for counsel was ambiguous and therefore did not trigger his Fifth Amendment rights. And even if the request was unambiguous, argues the government, the detectives ceased their interrogation and asked Defendant no further questions until he voluntarily reinitiated the conversation.

## II. **LEGAL BACKGROUND**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination "from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." Berkemer v. McCarty, 468 U.S. 420, 428 (1984). Part of the protection afforded by *Miranda* is the requirement that prior to any custodial interrogation, the police inform the suspect that he has the right to remain silent and the right to the presence of an attorney. *See* Miranda, 384 U.S. at 479. Once a suspect in custody has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). "This 'second layer of prophylaxis for the *Miranda* right to counsel,' McNeil v. Wisconsin, 501 U.S. 171, 176 (1991), is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]'" Davis v. United States, 512 U.S. 452, 458 (1994) (quoting Michigan v. Harvey, 494

U.S. 344, 350 (1990)). "Police officers simply cannot continue to question a suspect despite his request for counsel 'in the hope that [he] might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.'" United States v. Johnson, 400 F.3d 187, 194 (4th Cir. 2005) (quoting Smith v. Illinois, 469 U.S. 91, 99 (1984) (internal quotation marks and citations omitted)).

To invoke the right to counsel and prevent further interrogation, however, a suspect "must take an action that 'can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Johnson, 400 F.3d at 194 (quoting McNeil, 501 U.S. at 178). Whether a suspect has adequately invoked his right to counsel is an objective inquiry. While a suspect "need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459 (citation omitted). When a suspect unambiguously invokes his right to counsel, no further interrogation may take place until counsel is present or the suspect initiates further communication. Edwards, 451 U.S. at 482-85.

> If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

McNeil, 501 U.S. at 177.

Thus, to determine whether law enforcement officers have obtained a statement in violation of *Edwards*' "rigid prophylactic rule," Smith, 469 U.S. at 95 (internal quotation marks and citation omitted), a reviewing court examines two elements. A court must first "determine whether the accused actually invoked his right to counsel." *Id.* If so, the court must then decide

5

who initiated the further discussions that yielded the eventual statement. *See id.* Any statement procured by law enforcement through interrogation must be suppressed.

For purposes of *Miranda*, "interrogation" is "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The Court in *Innis* explained:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300-02 (footnotes omitted).

The Court noted that in determining whether police conduct is the functional equivalent of interrogation, the intent of the police, while not the focus, can be relevant to the determination. *See id.* at 301 n.7 (stating that the intent of the police "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response"); *see also* United States v. Blake, 571 F.3d 331, 341 n.4 (4th Cir. 2009) (noting that the state trial court's finding that the police officer made a statement to the suspect for the purpose of getting him to talk made a "significant difference" to the *Innis* determination).

"The inquiry mandated by *Innis* into the perceptions of the suspect is necessarily contextual," and whether particular statements by police constitute the functional equivalent of interrogation will "depend on circumstances that are too numerous to catalogue." United States

6

v. Payne, 954 F.2d 199, 203 (4th Cir. 1992). Isolated, offhand remarks that "invite[] no reply" do not rise above "subtle compulsion" and therefore do not constitute the functional equivalent to interrogation. United States v. Blake, 571 F.3d 331 (4th Cir. 2009).

In United States v. LeCraft, the defendant in custody requested to speak with a police sergeant with whom he had a long-standing relationship. No. 4:10-CR-21-FL, 2011 U.S. Dist. LEXIS 3753, at *8-10 (E.D.N.C. Jan. 14, 2011). Although off-duty, the sergeant traveled to the police station, dressed in plain clothes, to meet with the defendant. After telling the defendant that he did not wish to discuss the defendant's current arrest, the sergeant engaged in a conversation with the defendant. At some point during their thirty-minute conversation, the sergeant observed that the defendant was "getting old and should stop messing around," apparently referring to the events leading to the defendant's arrest. *Id.* at *9. The sergeant testified that he intended this comment as general "friendly advice." *Id.* In turn, the defendant told him that he had "only had the gun for protection because he had been robbed in the past." *Id.* The defendant later moved to suppress his statement to the sergeant, arguing that no *Miranda* warnings were given and that the sergeant's comment was the functional equivalent to interrogation.

Upon considering all of the circumstances, the district court concluded that the sergeant's statement did not rise to the level of interrogation for purposes of *Miranda*. *Id.* at *18-21. The sergeant's statement was "rather innocuous" and not designed to elicit an incriminating response from the defendant. *Id.* at *20. The district court noted that the defendant "was not subjected to any compelling influences, psychological plots, or direct questioning." *Id.* The defendant had specifically requested to speak with the sergeant "due to their extensive their extensive personal

7

history which was consistently cooperative in nature." *Id.* at *21. The district court therefore found no merit to the defendant's Fifth Amendment argument.

Although all interrogation must cease when a defendant invokes his right to counsel, a defendant can be subjected to further interrogation when "the accused himself initiates further communication, exchanges, or conversation with the police." Edwards, 451 U.S. at 484-85. A suspect may reinitiate contact by expressing "a willingness and a desire for a generalized discussion about the investigation." Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983). For a suspect to reinitiate communication with the police, the suspect's statements must be freely initiated, not the result of prodding or coercion. *See* Minnick v. Mississippi, 498 U.S. 146, 151 (1990). When a suspect asks for an attorney during his initial interrogation, a break in custody is required "that is of sufficient duration to dissipate [the interrogation's] coercive effects" before re-interrogation may occur. Maryland v. Shatzer, 130 S. Ct. 1213, 1222 (2010).

With these legal precepts in mind, the undersigned considers the facts of the instant case.

### III. ANALYSIS

As an initial matter, the undersigned notes that the instant motion to suppress concerns only those statements made by Defendant following the purported invocation of counsel, "Can I just get a lawyer." Defendant acknowledges, and the undersigned agrees, that any statements he made to the detectives after waiving his Miranda rights but prior to his invocation of counsel were lawfully obtained and not subject to suppression.

#### A. Request for Counsel

The government argues that Defendant's statement--"Can I just have a lawyer?"--was equivocal and therefore insufficient to invoke his Fifth Amendment right to counsel. *See* Davis, 512 U.S. at 459. In *Davis*, after properly waiving his Miranda rights, the defendant later stated,

8

"Maybe I should talk to a lawyer[.]" *Id.* at 455. When the interrogating law enforcement agents asked the defendant to clarify his request, the defendant stated, "No, I'm not asking for a lawyer" and "No, I don't want a lawyer." *Id.* The Court in *Davis* held that the defendant's purported invocation of counsel was equivocal and did not warrant a cessation of the conversation because the statement was not clear enough to alert a reasonable police officer that he was requesting an attorney. *Id.* at 458-62; *accord* Burket v. Angelone, 208 F.3d 172, 197 (4th Cir. 2000) (concluding that the defendant's statement "I think I need a lawyer" was an equivocal request for counsel).

Although the government's argument on this point is admittedly strong, it is ultimately unpersuasive. Unlike the agents in *Davis*, neither Detective Bacon nor Detective Smith asked Defendant to clarify what he meant by "Can I just have a lawyer?" Instead, Detective Bacon immediately responded, "You can. Most definitely." After several more statements to Defendant, the detectives left Defendant alone in the interview room. When Detective Smith returned a few moments later, he informed Defendant he had to sign a second Miranda form because Defendant had "lawyered up." These objective actions by the detectives indicate that Defendant's statement was sufficiently clear to alert them that Defendant was invoking his right to counsel. The detectives' subjective testimony confirms this fact. While Detective Smith found Defendant's statement less than "straightforward" he candidly agreed that, in his training and experience, Defendant's statement was "a fairly normal thing for somebody to say" in requesting an attorney. (Tr. 42). Detective Smith further agreed that he understood Defendant was requesting a lawyer. And while Detective Bacon felt that Defendant's statement presented a "gray area," he nevertheless "just took it as . . . being [Defendant] wants a lawyer." (Tr. 48).

9

Based on these facts, the undersigned concludes that Defendant's statement, "Can I just get a lawyer," was sufficiently clear to alert a reasonable police officer in the circumstances that Defendant was invoking his right to counsel, and that Defendant in fact invoked his Fifth Amendment right to counsel.

**B. Interrogation**

Having determined that Defendant invoked his right to counsel, the question becomes whether the interrogation immediately ceased as required by *Edwards*. The government argues that the detectives properly ceased their interrogation and asked Defendant no further questions before he voluntarily reinitiated his contact with them. However, the term "interrogation" includes "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 300-02. Here, Detective Smith and Detective Bacon made several statements to Defendant likely to elicit an incriminating response. When they interviewed Defendant, the detectives were aware that Defendant's girlfriend, Erika McClarin, had confessed her involvement in the crime and was seven months' pregnant with his child. The detectives utilized this knowledge after Defendant decided to invoke his right to counsel, telling him, "I can't believe you let your girl down like that" and "If that was my girl and she was pregnant, okay, I would take everything. I wouldn't want to have my baby in jail." By these statements, the detectives pressured Defendant to confess his involvement in the crime and "take everything" for the sake of his girlfriend and unborn child. Detective Smith further rebuked Defendant for his decision, stating that there were "other things we want to talk about that you've committed. But you didn't want to talk. You want her to go down like that." By castigating Defendant for his failure to "take everything" and admit his involvement in the
10

attempted robbery to protect his girlfriend and unborn child, the detectives without doubt understood that their statements would likely elicit an incriminating response.

Testimony by Detective Smith supports this conclusion. The United States Supreme Court and the Fourth Circuit agree that the intent of the police may be relevant in considering whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. *See* Innis, 446 U.S. at 301 n.7; Blake, 571 F.3d at 341 n.4. At the evidentiary hearing, Detective Smith forthrightly admitted that he made these statements to Defendant because he was "trying to continue to get [Defendant] to say things against his interest." (Tr. 43). Thus, unlike the "friendly advice" deemed innocuous in LeCraft, and opposed to off-hand, isolated remarks, the statements here represent a deliberate attempt on the part of the detectives to obtain incriminating information by "badgering a defendant into waiving his previously asserted *Miranda* rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). The undersigned therefore concludes that the statements by the detectives constituted the functional equivalent of interrogation, in violation of *Edwards*.

The government argues that Defendant voluntarily reinitiated further communication with Detective Smith when he stated, "I can talk to you by yourself?" It is the government's burden to show by a preponderance of the evidence that Defendant reinitiated further communication with detectives. *See* Shatzer, 130 S. Ct at 1219. Such communication must be freely initiated and not the result of prodding or coercion. *Id.* at 1220 (noting the increased risk of coercion resulting "not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated--pressure likely to 'increase as custody is prolonged'" (quoting Minnick, 498 U.S. at 153)). Here, there was no break in custody "of sufficient duration

to dissipate [the interrogation's] coercive effects." *Id.* at 1222. Indeed, there was no cessation of the interrogation itself before Defendant requested to speak to Detective Smith alone. Logically, Defendant could not "reinitiate" a conversation that never ceased.

When a suspect invokes his right to counsel, no further interrogation may take place until counsel is present or the suspect initiates further communication. Edwards, 451 U.S. at 482-85. The government concedes that "if the Court finds that the defendant invoked his right to counsel and did not reinitiate contact with Detective Smith, any subsequent statements made to ATF TFO Mendez would be inadmissible." (DE-144, p.5, citing United States v. Scalf, 708 F.2d 1540, 1544 (10th Cir. 1983) (holding that where a suspect invokes the right to counsel and does not reinitiate contact, "knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect" and noting that ruling otherwise would create a good faith exception to the exclusionary rule in the absence of direction from the Supreme Court)). Because Detective Smith and Detective Bacon continued to interrogate Defendant after he invoked his right to counsel, and as Defendant neither initiated further communication nor was given the opportunity to speak with counsel, the undersigned concludes that Defendant's motion to suppress the statements he made following his invocation of counsel should be granted. *See* United States v. Guess, 756 F. Supp. 2d 730, 745 (E.D. Va. 2010) (granting the defendant's motion to suppress in part where a detective's question regarding ownership of the vehicle amounted to an interrogation for *Miranda* purposes and the question about ownership of the vehicle was reasonably likely to elicit an incriminating response).

IV. **CONCLUSION**

Because the statements made by Defendant to law enforcement officers after he invoked his right to counsel were obtained in violation of his Fifth Amendment right against self-incrimination, such statements should be suppressed.

The undersigned therefore RECOMMENDS that Defendant's motions to suppress (DE-114, DE-123) be GRANTED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Monday, June 11, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE